IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LAURIE A. NEEMANN,                    )
                                     )          8:08CV286
            Plaintiff,               )
                                     )
      v.                             )          MEMORANDUM AND ORDER
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of the Social Security Administration, )
                                     )
            Defendant.               )

      This is an action for judicial review of a final decision of the Commissioner of the

Social Security Administration ("Commissioner").   Laurie A. Neemann[1] ("Neemann")

appeals a final determination of the Commissioner denying her application for Social

Security benefits.  This court has jurisdiction under 42 U.S.C.  §§ 405(g) and 1383(c)(3).

On December 3, 2004, Neemann filed an application for Title XVI supplemental security

income ("SSI"), alleging disability due to a seizure disorder, thyroid illness, and lumbar

disorder beginning December 1, 1988.  Filing No. 13, Social Security Transcript ("Tr."), 7,

102, 115.  Neemann later amended her alleged onset date to April 22, 2003.  Tr. at 16.

      The Social Security Administration denied Neemann's claim on April 14, 2005, and

upon reconsideration on July 6, 2005.  Tr. at 57-60, 63-66.  On May 16, 2007, both the

claimant and an impartial vocational expert ("VE"), Anita Howell, appeared and testified at

a hearing in front of an Administrative Law Judge ("ALJ"), James Gillet.  Tr. at 290-323.

The ALJ concluded Neemann has not been under a disability within the meaning of the

Social Security Act since April 22, 2003.  The ALJ therefore denied her benefits on August

---

[1]The transcript reflects that the plaintiff has signed her name as Laurie Neemann.  The Clerk's Office
is directed to correct the docket sheet as to the spelling of plaintiff's last name.

6, 2007.  Tr. at 13-24.  Following the ALJ's denial, the claimant requested an appeal before the Social Security Appeals Council ("Council").  Tr. at 12.  On May 7, 2008, the Council denied Neemann's request for review.  Tr. at 5-7.  Thereafter, the claimant filed this action in the United States District Court for the District of Nebraska.

### I.  BACKGROUND

Laurie A. Neemann is 47 years old.  Tr. at 23.  Neemann repeated the ninth grade prior to dropping out of high school.  She received her GED, but has certain cognitive difficulties in the areas of grammar and math.  Neemann testified before the ALJ that while in school she "was very, very slow in math," and that she tends to "get messed up when it comes to trying to write something that has to be graded and have certain punctuations in it."  Tr. at 300-01.  Neemann's earnings record shows no income since 1986.  She was occasionally employed as a babysitter, but had no substantial gainful activity.  Tr. at 108-09.

She filed for Social Security benefits due to an alleged disability consisting of low back pain, thyroid illness, and a seizure disorder.  Tr. at 102.  Neemann has recorded brief notes about many of her seizures in a log, which dates from December 22, 1988, through June 6, 2006.  Tr. at 144-166, 180-82.  Neemann also suffers from hypertension, which she controls with medication, and hypothyroidism, which she controls with levothyroxine. Tr. at 174, 226.  Neemann was also diagnosed with borderline intellectual functioning.  Tr. at 195.  She currently takes Phenobarbital and Synthroid medications daily.

On April 16, 2003, Neemann went to the emergency room, complaining of tremors in her left arm with weakness in her left leg and a severe headache.  Tr. at 250.  J. Hogue, M.D., the emergency room doctor, noted that Neemann had not taken her medication for

2

at least two days because she could not pay for it.  He diagnosed Neemann with partial complex seizure disorder with an abnormal CT of the brain and hypocalcemia.  He also noted that a CAT scan of Neemann's head suggests a cerebrovascular accident, and he recommended she be admitted to the hospital for further MRI work.  Tr. at 251.

Thomas A.  McKnight, M.D., has been Neemann's treating physician since 1996.  Tr. at 270.  In June 2006, McKnight found that Neemann had lumbar strain.  She went to have an MRI of her lumbar spine, which showed disk degeneration and mild narrowing from L3 to L4 through L5 to S1, as well as mild broad disk bulges at T11 to T12, L3 to L4, and L5 to S1.  The MRI also revealed moderate sized central focus disc extrusion at L4 to L5 with minimal mass effect upon both exiting S1 nerve roots.  Tr. at 242.  On May 15, 2006, Martin F.  Sears, M.D., performed a full colonoscopy on Neemann, who, prior to the operation, was experiencing rectal bleeding.  Neemann's postoperative diagnosis stated she had mild internal hemorrhoids.  Tr. at 245.

On August 29, 2006, Dr. McKnight stated that Neemann continues to suffer back pain and lumbar pain at a level of 8 out of 10.  He stated that Neemann's MRI of May 2006 revealed degenerative joint disease and disc bulging and central disc extrusion.  Dr. McKnight noted that these medical problems combined with Neemann's recurring pain makes it difficult for her to stand, walk or work.  Tr. at 228.  On March 9, 2007, Dr. McKnight completed a physical medical source statement, which states Neemann's abilities despite her impairments.  Tr. at 268.  On the statement, Dr. McKnight listed Neemann's prognosis as "poor."  Dr. McKnight stated that in an eight-hour workday, Neemann could only sit for two hours at a time, stand for 45 minutes at a time, and walk for 30 minutes at a time.  Dr. McKnight also noted that Neemann must lie down for 15

3

minutes at a time for a total of two to three hours during an eight-hour workday, in addition to regularly scheduled breaks and lunch periods.  He also stated that Neemann must elevate her legs to chest level for two hours or 25 percent of an eight-hour workday.  In terms of an eight-hour workday, Dr. McKnight noted that Neemann is able to "rarely or never" kneel, crouch, or participate in activities involving unprotected heights, and she is able to "occasionally" bend, stoop or climb.  He found that she can "occasionally" participate in activities around moving machines.  He noted she can "occasionally" be exposed to marked changes in temperature and humidity.  Tr. at 268-69.

On August 22, 2005, Neemann's treating neurologist since 1996, Joel T. Cotton, M.D., stated in a letter to Dr. McKnight that Neemann continues to have periodic seizures averaging around once each month, during which she is temporarily unresponsive.  *Id.* at 263, 267.  Dr. Cotton also stated that Neemann will often fall as a result of her seizures and that she may not have a warning.  In a conference report dated May 2, 2003, Dr. Cotton notes that Neemann was hospitalized after experiencing "what sounds like a focal seizure involving her left arm, then apparently spreading to involve her head and face."  Tr. at 264.  Dr. Cotton states that she had a CT scan and MRI which show evidence of a possible brain lesion in her right parietal lobe.  Tr. at 264.  In a phone report dated December 12, 2004, Dr. Cotton stated that Neemann had been taking Valproic acid, an anticonvulsant, for her seizure disorder, but had stopped several months prior because she could no longer afford it.  TR. at 262.  He also stated that she had asked him if he could get her on disability.  Dr. Cotton told Neemann that he believed her seizures were not frequent enough, at the time, for her to qualify for disability.  He instructed her to take two extra Phenobarbital a day, and to try to get on some type of indigent program in order to

4

pay for the Valproic acid.  He stated that she needs something stronger than Phenobarbital to control the seizure disorder.  Tr. at 262.  In his letter of August 22, 2005, to Dr. McKnight, Dr. Cotton stated that Neemann "apparently has not had much success through the indigent programs that she has looked into," and that he told Neemann that sometimes the drug companies such as Abbott, which makes Depakote®, could help her.  Tr. at 263.

On March 7, 2005, Manjula Tella, M.D., a consultative physician, conducted a physical examination of Neeman.  Tr. at 231-33.  Dr. Tella concluded she had a history of seizures, with a frequency of two seizures each year, musculoskeletal back pain with some sciatic component, and ongoing cognitive symptoms that were probably medication related. Dr. Tella stated Neemann has some limitations with driving due to "unpredictable seizures/spells."  Tr. at 233.  Dr. Tella also stated she would probably benefit from a change in antiepileptic medication, but that affording medication has been a problem.  He stated Neemann has no limitations with activities of daily living.  Tr. at 233.

Neemann's radiology report from March 7, 2005, which lists Thom Chael, M.D., as the attending physician, stated Neemann had normal lumbar spine and calcific densities projecting over the inferior pole of the right kidney, which may represent some right renal stones.  Tr. at 230.  On April 13, 2005, Dr. Grossman, a consultative physician, completed a Physical Residual Functional Capacity Assessment, which lists seizure disorder as Neemann's primary diagnosis, high blood pressure as a secondary diagnosis, and obesity as another alleged impairment.  Tr. at 212, 219.

On April 5, 2005, Patricia J. Blake, Ph.D., a consultative psychologist, conducted a psychological evaluation of Neemann.  Tr. at 235-38.  In the "Personal and Family History" section of her report, Dr. Blake noted that Neemann reports her family history is

5

positive for substance abuse and possible mental retardation.  Neemann reports being placed in "special ed for math" in the 7th and 8th grades.  Tr. at 235.  She reports repeating 9th grade and dropping out of high school at age 15.  Tr. at 236.  In the "Current Mental Functioning" section of her report, Dr. Blake noted that Neemann was unable to calculate simple addition, subtraction, multiplication, or division problems.  But, Dr. Blake believes Neemann's ability to perform serial 3's with only one arithmetic error suggests that Neemann possesses the attention and concentration needed for simple task completion.  Dr. Blake noted that Neemann's social judgment for posed events is fair, her insight is poor, and she is estimated to be of below average intelligence.  Tr. at 236.

Dr. Blake administered the Wechsler Memory Scale – Third Edition ("WMS-III") to Neemann.  Tr. at 236.  Her scores on the WMS-III were categorized as "average" for the following primary indexes:  auditory immediate, auditory delayed, and auditory recognition delayed memory.  Tr. at 237.  Neemann's scores were categorized as  "low average" for the immediate and general memory primary indices.  Neemann's scores were categorized as "borderline" for the visual immediate, visual delayed, and working memory indices.  In the "Current Adaptive Functioning" section of her report, Dr. Blake noted that Neemann reports that she lives with her fiancé Martin and she gets up at about "4 a.m."  Tr. at 237.  According to Dr. Blake, Neemann reports no restriction in activities of daily living.  Neemann reports limited social functioning, but Dr. Blake believes this appears to be Neemann's choice.  Neemann does not report any symptom exacerbation when stressed.  Dr. Blake noted that Neemann demonstrates adequate ability to understand, remember, and carry out short and simple instructions under ordinary supervision.  However, Dr. Blake

found that Neemann does not appear able to manage financial benefits because of her inability to perform simple arithmetic calculations.  Tr. at 237.

The "Diagnosis" section of Dr. Blake's evaluation stated the following: Axis I, no diagnosis; Axis II, R/O Borderline Intellectual Functioning, V62.89; Axis III, Seizure disorder, by report; Axis IV, Occupational, financial; and Axis V, GAF = 70.  Tr. at 237-38. In her "Prognosis" section, Dr. Blake noted:

> Laurie Neemann is a 43 year old female with a GED and work experience limited to babysitting.  She has not worked for the past several years because she has not found any babysitting jobs and she cannot drive.

> Assessment yields memory functioning in the low average range.  Ms. Neeman's visual memory appears slightly impaired relative to her other memory abilities, but consistent with her educational and vocational experience.

Tr. at 238.

Dr. Blake completed a questionnaire following her evaluation of Neemann in which she noted that Neemann has the ability to relate appropriately to co-workers and supervisors, to adapt to changes in her environment, and to sustain concentration and attention needed for task completion.  Tr. at 239.  Dr. Blake also noted in the questionnaire that Neemann has the ability to understand and remember short and simple instructions, but it would be best for the instructions to be delivered verbally.  Tr. at 239.

On April 13, 2005, Linda Schmechel, Ph.D., a consultative psychologist, conducted a psychiatric evaluation of Neemann.  Tr. at 194.  Dr. Schmechel completed a Psychiatric Review Technique form, which diagnoses Neemann with borderline intellectual functioning disorder.  Tr. at 195.  In the "Part B" criteria of the listings, for the categories of "restriction of activities of daily living" and "difficulties in maintaining social functioning," Dr. Schmechel

7

found that Neemann is mildly limited.   In the category "difficulties in maintaining concentration, persistence, or pace," Dr. Schmechel found that Neemann is moderately limited.  She also found Neemann had no episodes of decompensation.  Tr. at 204.  Dr. Schmechel noted the evidence fails to establish the presence of "Part C" criteria, which pertain to organic mental disorders.  Tr. at 205.

On November 5, 2007, the ALJ issued a decision denying disability benefits to Neemann.  Tr. at 13.  The ALJ found that Neemann has the following severe impairments: degenerative joint disease, with back pain and a herniated disk at L4-5; obesity; and seizure disorder, partly controlled by medication.  Tr. at 18.  In this appeal, Neemann alleges that the ALJ's decision is unsupported by substantial evidence or that his omissions otherwise constitute an error of law requiring reversal and remand due to insufficient hypothetical questions.

## II.  DISCUSSION

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole.  *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir.  1996). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support a decision." *Cox v. Apfel*, 160 F.3d 1203, 1206-07 (8th Cir. 1998).  In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the [Commissioner's] decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits.  *See* 20 C.F.R. § 404.1520(a) (1998); Cox, 160 F.3d at 1206.  Under the Commissioner's regulations, the determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity ("RFC") and his or her age, education and work experience.  20 C.F.R. § 404.1520(a); *Flannery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997).  The Commissioner determines: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment–one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. *Cox*, 160 F.3d at 1206.

### A.  ALJ's Findings

The ALJ found that Neemann has not engaged in substantial gainful activity since April 22, 2009, which is the amended onset date of her alleged disability.  In fact, Neemann has no history of substantial gainful activity.   The ALJ found that Neemann has the following severe impairments: degenerative joint disease, with back pain and a herniated disk at L4-5; obesity; and seizure disorder, partly controlled by medication.   The ALJ determined that Neemann's hypertension and hypothyroidism are controlled with medication.  Tr. at 18.  The ALJ stated, "It has been recommended that the diagnosis of

borderline intellectual functioning be ruled out." Tr. at 18, 195, 237. The ALJ noted that while Neemann does have certain cognitive deficits in grammar and math, she does not have a severe mental impairment. The ALJ then listed the "Part B" limitations noted above, and stated that "Part C" criteria are not met. The ALJ found that Neemann does not have an impairment or combination of impairments that meets or medically equals one listed in 20 CFR Part 404, Subpart P, Appendix 1. He determined that her weight is not associated with other impairments of listing-level severity and that her seizure disorder is not of listing-level severity or frequency. Tr. at 18-19.

The ALJ stated that, "After careful consideration of the entire record," Neemann has the RFC to perform sedentary work, "at best." Tr. at 19. He found that when seated, she needs to be able to elevate her feet three to six inches, whenever necessary, during the workday. The ALJ noted that Neemann is moderately limited in the area of understanding and remembering detailed instructions, and that she has difficulty with business-level writing, grammar, and punctuation. Tr. at 19. The ALJ stated that he has not given Neemann's seizure log great weight because most of the entries are unverified and most of her seizures have gone unwitnessed. The ALJ acknowledged that Neemann suffers from multiple impairments, but stated that when viewed individually or combined, they are not disabling. He found that the frequency of Neemann's seizures is "not substantiated in the medical evidence of record." Tr. at 20.

The ALJ noted that Dr. Cotton stated that Neemann cannot drive and should avoid high places and dangerous machines, but that she otherwise is not limited by her seizure disorder. The ALJ stated that Dr. Tella concluded, after completing a consultative physical examination of Neemann, that she "has no limitations with activities of daily living." Tr. at

10

21.   The ALJ noted that Dr. Blake's evaluation of Neemann showed that her memory functioning was in the low average range.   He notes, "Dr. Blake recommended that borderline intellectual functioning be ruled out," but that Dr. Blake suggested Neemann was capable of understanding, remembering, and carrying out short and simple instructions, best done if delivered verbally.   Tr. at 21-22.

With regards to Neemann's seizure disorder, the ALJ notes that Dr. Cotton, her treating neurologist since 1996, has recommended that she take Valproic acid on multiple occasions.   The ALJ notes that Dr. Cotton suggested Neemann would have better control of her seizures if she were taking Valproic acid, which Dr. Cotton states is not expensive. The ALJ acknowledged Neemann's back and knee pain, but states he has addressed these concerns by finding she has an RFC that limits her to sedentary work, during which she can elevate her legs.

The ALJ did not give great weight to Neemann's "implicit allegation that she is unable to engage in full-time, competitive, gainful employment on a sustained basis." Tr. at 23.   He states that she has no record earnings since 1986 and that her lack of employment, "even during periods she is not alleging disability, reflect unfavorably on her credibility." Tr. at 23.   He notes that she has at least a high school education, is able to communicate in English, and has no past relevant work.   He states that he asked the VE whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and RFC, and the VE testified that the individual would be able to perform the following unskilled, sedentary jobs:  order clerk, call-out operator, and information clerk.   The ALJ accepted the VE's testimony that, even if Neemann needed to

11

elevate her feet nine to twelve inches, rather than three to six inches, she could still work as an order clerk.  Tr. at 23-24.

### B.  Neemann's Testimony

On May 16, 2007, Neemann testified before the ALJ.  Tr. at 292.  When asked if she was taking any medication, Neemann testified that she was on phenobarbital for her seizures, Synthroid for her thyroid, and Diovan for her high blood pressure.  She further testified that she still has seizures even while taking the phenobarbital.  Tr. at 300-01.  With regards to her condition after having had a seizure, she stated, "It's like, I don't know, I guess you could say I'm kind of like a zombie.  I have no idea what took place, what happened." Tr. at 302.  She also testified that her seizures come without warning.  She mentioned that she takes Tylenol when she experiences back pain, but that Dr. McKnight prescribed muscle relaxers on two occasions when she could not "sit down or stand up or anything without being in agony." Tr. at 304.  She testified that she is not on Medicaid or Medicare, has no health insurance, and is not working.  She stated that the last time she worked was as a babysitter, "for an hour a day or so,"  in September of 1998.  Tr. at 305-06.

As of April 13, 2007, about a month prior to her hearing before the ALJ, Neemann weighed 253 pounds.  Tr. at 272.  She is approximately 5 feet, 4 inches tall.  Tr. at 18. When the ALJ asked Neemann if her doctors ever put her on a weight-loss program, diet, or suggest that she lose weight, she testified that only one of her doctors a long time ago suggested that she lose at least 50 pounds.  She testified that none of her doctors have ever told her she needed to be on a diet or that her weight is partially causing her back problems.  Tr. at 307.

When asked about Dr. Cotton, her treating neurologist, Neemann stated that she feels like he is "washing his hands" of her and that he does not want to see her any more than he has to.  Tr. at 310.  The ALJ asked Neemann to tell him whether she thinks Dr. Cotton is addressing her problems properly.  She testified about how Dr. Cotton informed her that her seizures are not frequent enough to qualify her for disability benefits.  When asked why Neemann did not begin to see another neurologist, after she realized she had a different perspective than Dr. Cotton, she testified, "Dr. Cotton is willing to, you know, when I was, I can make little piddly payments of, say $5.00, $10.00, a month if I've got the money, whereas any other doctors, you've got to have the insurance up front to show them. . . ."  Tr. at 311.  She also testified that Dr. McKnight initially referred her to a different "very good neurologist," but that Dr. Cotton replaced him when he retired.  Tr. at 309-12.

During the hearing, Neemann's attorney, asked Neemann about past problems with her ankle.  When asked which ankle hurt, she testified, "I'd sprained them both so many times I can't remember which is which," but that the right one tends to swell up more than the left.  Tr. at 308.  She further testified that her ankle issue is not a current problem.  With regards to alleviating pain, she testified that she sits in a reclined position several times throughout the day.  Tr. at 308.  When the ALJ asked Neemann why she needs to elevate her feet to chest level, as instructed by Dr. McKnight, she stated that it is probably to help relieve pain in her ankle and back.  She stated that her feet and ankles tend to swell if she is walking somewhere or if she stands for too long of a period of time.  Tr. at 314.

### C.  Treating Physician

The court finds that the ALJ erred in discounting the opinion of Neemann's treating physician, Dr. McKnight, regarding workday limitations, when deciding whether any jobs exist for Neemann in the national economy.  Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion.  *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'"  *Prosch v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (*quoting* 20 C.F.R. § 404.1527(d)(2) (2006)).  The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions.  *Hogan v. Apfel*, 239 F.3d at 961.  An ALJ cannot substitute his opinion for the medical opinions.  *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).

The ALJ noted that Dr. McKnight, Neemann's treating physician since 1996, believes she needs to be able to recline for a total of two hours in an eight-hour workday, and elevate her legs to chest level for two hours out of an eight-hour workday.  These limitations apply to Neemann's back and ankle pain.  When considering Dr. McKnight's medical opinion, the ALJ simply stated, "these limitations appear to be out of proportion to and are unsupported by the medical evidence."  Tr. at 21.  The ALJ says nothing further to explain how or why Dr. McKnight's limitations are "out of proportion" or unsubstantiated.  Furthermore, when Neemann's attorney included Dr. McKnight's limitations in a

14

hypothetical posed to the VE, as discussed in the next section, the VE stated that if either of the two limitations applied, Neemann would not be able work.

Dr. Cotton has been Neemann's treating neurologist since 1996.  The ALJ stated he gave Dr. Cotton's opinion greater weight than Dr. McKnight's opinion because, "he is Board-certified in Neurology, as compared to Dr. McKnight, who is Board-certified in Family Medicine."  Dr. Cotton primarily sees Neemann for her seizure disorder, not her back pain or any other illnesses.  Dr. Cotton never offers a "contradictory medical opinion" to Dr. McKnight's suggested limitations.  The court finds the ALJ erred in discounting Neemann's treating physician's opinion regarding her workday limitations.  Dr. McKnight did not offer "inconsistent opinions" about Neemann's workday limitations, and no other "medical assessments supported by superior evidence" exist that would discount his opinion.

### D.  Hypothetical Questions

Neemann argues the ALJ erred in failing to include or mention her limitations in mathematics in any of the hypothetical questions posed to the VE.  To assist an ALJ making a disability determination, a VE is many times asked a hypothetical question to help the ALJ determine whether a sufficient number of jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant.  A hypothetical question is properly formulated if it incorporates impairments "supported by substantial evidence in the record and accepted as true by the AKH." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (citing *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)).  "[A] vocational expert's responses to hypothetical questions posed by an ALJ constitutes substantial evidence only where such questions precisely set forth all of the claimant's physical and

mental impairments." *Wagoner v. Bowen*, 646 F. Supp. 1258, 1264 (W.D. Mo. 1986) (citing *McMillian v. Schweiker*, 697 F.2d 215, 221 (8th Cir.1983)).

Courts apply a harmless error analysis during judicial review of administrative decisions that are in part based on hypothetical questions. For judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003). A VE's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997) (*citing Porch v. Chater*, 115 F.3d 567, 572-73 (8th Cir. 1997), *and Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996)).

After Neemann's testimony at the hearing on May 16, 2007, the ALJ posed a series of four hypothetical questions for the VE to consider. The first hypothetical the ALJ posed to the VE asked her to consider an individual with a vocational profile identical to Neemann's, with a high school education. The ALJ asked the VE to consider an individual with difficulty in writing, specifically for business purposes, and especially with punctuation. The ALJ told the VE that the vocational profile would be the same for all three hypothetical questions. Tr. at 317.

For the first hypothetical, the ALJ stated that the individual has an overarching RFC for sedentary work. The individual cannot push or pull repeatedly with the lower extremities, cannot reach above her shoulder, and can only occasionally bend, twist, or turn. The ALJ stated that the individual cannot crawl, climb ropes or ladders, use air or vibrating tools, or use motor vehicles. The individual can occasionally climb, stoop, or

16

squat, but her ability to kneel is less than occasional.  She cannot work around moving machinery or at unprotected heights.  When seated, the individual requires the ability to shift in position and to raise her feet nine to twelve inches, but probably not constantly.  However, if she needs to sit and raise her feet all day, she must be able to do so.  The individual's ability to understand and remember detailed instruction is moderately limited at all levels, and she has no relevant past work.  In response to the ALJ's first hypothetical individual, the VE stated that production type jobs would not be possible.  The VE testified the only remaining job would be the sedentary job of an order clerk.  Tr. at 317-19.

For the second hypothetical, the ALJ stated that the individual was the same as the individual from the first hypothetical, except for one difference.  The second individual would need a footrest to allow her to raise her feet up to six inches, at most.  The VE testified that in the case of the second hypothetical individual, two additional jobs could be added, a callout operator, and an information clerk.  The two additional positions, similar to the order clerk, are sedentary jobs.  Tr. at 319-21.

For the third hypothetical, the ALJ stated that he wanted the VE to consider the individual from the second hypothetical, but to add the condition that the individual will have seizures twice a month, which will eliminate her ability to perform on the job for about three minutes each time.  The ALJ stated that the seizures occur randomly, without warning.  The ALJ asked the VE if the additional functional limitation of the seizures would change her answers to the first two hypothetical questions.  The VE testified:

> If this was on a consistent basis each month, even though it's a short period of time, each time, the jobs all require providing information to either co-workers or the general public and if there's an interruption in a discussion or in the process of providing information and it's on a consistent basis, I think

17

that such a person would not be able to hold a job over a period of time. That would not be considered acceptable performance.

Tr. at 326.

The ALJ then moved onto his fourth hypothetical and asked the VE what her answer would be if the individual suffered from a seizure only once a month, as opposed to twice. The VE testified that she believes an employer would be more understanding if the seizures only happened once a month, and that she thinks an individual with once-monthly seizures could hold a job. Tr. at 325-26.

Neemann's attorney then asked the VE to reconsider the first hypothetical the ALJ posed, but to increase the feet-raising ability requirement from between nine and twelve inches to waist height. The VE testified that if the individual in the first hypothetical had to raise her feet to waist height, the individual would not be able to hold any of the three jobs she had previously mentioned. Counsel for Neemann also asked the VE to consider a hypothetical individual with no past relevant work and the same age and education as Neemann, who would need to recline "in a non-work conducive manner" for two hours in an eight-hour workday. Tr. at 327. The VE testified that the reclining requirement "would be outside the definition of competitive employment," and there would be no jobs available for such an individual. Tr. at 326-27.

The ALJ posed a series of hypothetical questions to the VE. However, the court finds the ALJ erred in not considering all of Neemann's impairments when forming his hypothetical questions. The court finds the ALJ failed to include Neemann's mathematical limitations in any of his hypothetical questions. Neemann testified that she was "very, very slow at math." Tr. at 301. After completing a psychological evaluation of Neemann, Dr.

18

Blake noted that Neemann was not able to calculate simple addition, subtraction, multiplication, or division problems, and that she does not appear able to manage financial benefits. Dr. Blake stated that Neemann was of below-average intelligence. Tr. at 236. Dr. Blake also found that borderline intellectual functioning disorder needed to be ruled out. Tr. at 237. Eight days later, Dr. Schmechel completed a psychiatric evaluation of Neemann, and diagnosed her with borderline intellectual functioning disorder. Tr. at 195. Neemann's limited ability in mathematics, as part of her borderline intellectual functioning disorder, is an impairment that is supported by substantial evidence in the record. Nonetheless, for reasons the ALJ fails to disclose, he omitted Neemann's mathematical difficulties from his hypothetical questions. The ALJ's failure to include Neemann's mathematical limitations in any of his hypothetical questions does not constitute harmless error. After considering each of the ALJ's hypothetical questions, the VE stated that Neemann should be able to perform three jobs: order clerk, call-out operator, and information clerk. However, each of these jobs has a *Dictionary of Occupational Titles* ("DOT") mathematical development requirement that seems to exceed Neemann's ability. Both the jobs of information clerk and call-out operator have a level two mathematical development requirement, which entails the ability to do such things as, "add, subtract, multiply, and divide all units of measure," and "perform the four operations with like common and decimal fractions." According to the DOT, the order clerk job has a level one mathematical development requirement**,** which entails the ability to do such things as, "add and subtract two digit numbers," "multiply and divide 10's and 100's by 2, 3, 4, 5**,**" and, "perform the four basic arithmetic operations with coins as part of a dollar." Had the ALJ not erred in omitting Neemann's mathematical limitations from his hypothetical questions,

19

the outcome of the case would have likely been changed on that basis alone.  Neemann's mathematical inability would have conflicted with the DOT's mathematical requirements for the three jobs the VE listed.

Likewise, the court finds the ALJ failed to consider the VE's testimony when asked the third hypothetical question.  The VE stated that an individual with a combination of impairments that included having seizures twice a month, "would not be able to hold a job over a period of time." Tr. at 326.  When the ALJ modified the third hypothetical to entail an individual who has seizures only once a month, the VE responded, "I think they could hold a job." Tr. at 326.  The ALJ did not accept the VE's  testimony regarding an individual who experiences seizures twice a month.  The ALJ stated that Neemann "testified that she has seizure-like episodes of loss of awareness, but the frequency of these episodes is not substantiated in the medical evidence of record." The ALJ did not give Neemann's seizure journal great weight and noted that most of her seizures have not been witnessed.  Tr. at 20.  According to Dr. Cotton's notes from August and September of 2005, Neemann had two seizures in June of 2005, one seizure in July of 2005, and two seizures in August of 2005.  Tr. at 262.  The ALJ failed to explain why he accepted the VE's testimony regarding a person who has a seizure once a month, but rejected the VE's testimony regarding a person who has seizures twice a month.

The court also finds the ALJ erred in rejecting the VE's testimony regarding an individual with a combination of impairments that included the ability to raise his or her legs to chest level for two hours out of an eight-hour workday.  The court also finds the ALJ erred in rejecting the VE's testimony about an individual who required the ability to rest or recline for two hours in an eight-hour workday.  The VE testified that an individual with

either of those requirements would not be able to work. Tr. at 226. As mentioned above, Dr. McKnight, Neemann's treating physician, found that Neemann needed to be able to lie down or rest for up to two hours in an eight-hour workday and to elevate her legs to chest level for up to two hours in an eight-hour workday. Tr. at 268. The ALJ did not explain why he rejected the VE's testimony regarding the above workday requirements other than to state, "these limitations appear to be out of proportion to and are unsupported by the medical evidence." Tr. at 21.

The court finds that Neemann is disabled. Had the ALJ accepted both Dr. McKnight's opinion and the VE's testimony considering the workday limitations, he would have had no other choice but to conclude that there are no jobs in the national economy Neemann can perform. In addition, the ALJ failed to include Neemann's mathematical limitations in any of the hypothetical questions posed to the VE. Had the ALJ included the mathematical limitations, conflict would have existed between Neemann's abilities and the mathematical requirements in the DOT for the three jobs she could supposedly perform. Thus, because the record presented to the ALJ contains substantial evidence supporting a finding of disability, the court may reverse the case for entry of an order granting benefits to the claimant. *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir. 1984). "Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir. 1992). In this case, the substantial evidence supporting a finding of disability is overwhelming. Under the circumstances, further

hearings would merely delay benefits; therefore, an order granting benefits is appropriate. *Id.*

THEREFORE, IT IS ORDERED:

1.   The findings and conclusions of the ALJ are reversed and benefits are awarded. This cause is remanded to the Commissioner for computation and payment of benefits.

2.   A separate judgment shall be entered in conjunction with this Memorandum and Order.

3.   The plaintiff shall have fourteen days from the date of this order to file a motion and brief with appropriate documentation requesting attorney fees in this case.  Defendant shall have fourteen days after plaintiff files her motion in which to file a response.

DATED this 6th day of July, 2009.

BY THE COURT:


s/ Joseph F.  Bataillon
Chief District Judge

This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.